ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Ricoh USA, Inc. ) ASBCA No. 59408
)
Under Contract No. W9124M-12-D-0001 )

APPEARANCES FOR THE APPELLANT: Thomas L. McGovern III, Esq.
Nicole D. Picard, Esq.
Hogan Lovells US LLP
Washington, DC

APPEARANCES FOR THE GOVERNMENT: Raymond M. Saunders, Esq.
Army Chief Trial Attorney
CPT Jessica E. Hom, JA
Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE PAUL

This is a timely appeal of a contracting officer's (CO's) final decision denying appellant Ricoh USA, Inc.'s (Ricoh's) claim in a total amount of $771,131.03. The Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109, is applicable. A hearing was held at the Board's offices; only issues of entitlement are before us for decision.

FINDINGS OF FACT

1. On 22 November 2011, the Army's Contracting Command at Fort Stewart, Georgia, issued Solicitation No. W9124M-12-T-0007 (R4, tab 2 at 1). This was a Request for Questions (RFQ) to "provide lease and flat rate maintenance including supplies...of new Multifunctional Devices (MFDs) on a firm fixed price" (*id.* at 63 of 77). The MFDs were to "be configured with copying, network printing, scanning, and faxing with audit capabilities, tailored to the needs of each organization/customer entity" (*id.*). The customer entities involved were the 3rd Infantry Division (3rd ID) and Fort Stewart's Garrison. The RFQ provided for a one-year base period (1 April 2012 – 31 March 2013), as well as four, 12-month option periods. (*Id.* at 64 of 77)

2. The RFQ stated an estimated requirement of 820 MFDs "in the initial phase of this program." It also provided:

> During the life of this contract, the Government expects to
> add or remove an undetermined number of MFD's as
> requirements change due to organizational realignment or

organizations added or deleted or combined. Any copiers installed after the initial installation date will terminate at the same time and be billed at the same monthly rate as the original copiers.

The RFQ stated the expectation of "an undetermined and unlimited amount of on-site equipment moves during this contract period and these will be done by the offeror at no charge to the government." (R4, tab 2 at 63 of 77)

3. The RFQ also provided:

No guarantee is given that listed quantities will be leased. Estimated quantities are based on current number of MFDs approaching contract ending dates and projected new business. The contractor will provide IT support during the initial installation of the MFDs...and when requested during the entire term of the contract.

(R4, tab 2 at 66 of 77)

4. The RFQ stated further:

The government reserves the right to increase or decrease quantity of MFDs throughout the duration of the contract by modification. Government shall provide vendor with thirty days notice when requesting additions or deletions.[1]

(R4, tab 2 at 73 of 77)

5. The RFQ also provided:

15. **Discontinuance of Service:** Upon receipt by the contractor of written notice from the contracting officer, MFD service may be discontinued 30 days thereafter. The contracting officer may discontinue MFD services on shorter notice than specified above when agreed to by the contractor. The contracting officer may extend the original discontinuance date upon written notice to the contractor, provided such notice is furnished at least 15 days prior to the

---

[1] The RFQ stated in two places that ownership of the MFDs would remain with the contractor (R4, tab 2 at 63, 73 of 77).

2

original discontinuance date. A discontinuance notification will contain the following information: (a) MFD location by activity, building and room number, (b) MFD model and serial number, (c) meter reading, and (d) date MFD will be available for removal. The government will then make the MFD available for pickup by the contractor's technical representative. It will be the responsibility of the contractor to coordinate removal of the MFD with the army's authorized personnel. Removal of MFDs will be at the contractor's expense. There is no early termination fee, penalty or cost associated with not exercising option years.

(R4, tab 2 at 76-77 of 77)

6. The RFQ contained various pertinent FAR clauses, including FAR 52.216-18, ORDERING (OCT 1995), which stated:

> (a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the individuals or activities designated in the Schedule. Such orders may be issued from 1 April 2012 through 31 March 2017.
>
> (b) All delivery orders or task orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order or task order and this contract, the contract shall control.
>
> (c) If mailed, a delivery order or task order is considered "issued" when the Government deposits the order in the mail. Orders may be issued orally, by facsimile, or by electronic commerce methods only if authorized in the Schedule.

(R4, tab 2 at 57 of 77) Also included in the RFQ was FAR 52.216-21, REQUIREMENTS (OCT 1995), which provided:

> (a) This is a requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies or services specified in the Schedule are estimates only and are not purchased

3

by this contract. Except as this contract may otherwise provide, if the Government's requirements do not result in orders in the quantities described as "estimated" or "maximum" in the Schedule, that fact shall not constitute the basis for an equitable price adjustment.

(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. Subject to any limitations in the Order Limitations clause or elsewhere in this contract, the Contractor shall furnish to the Government all supplies or services specified in the Schedule and called for by orders issued in accordance with the Ordering clause. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

(c) Except as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule.

(d) The Government is not required to purchase from the Contractor requirements in excess of any limit on total orders under this contract.

(e) If the Government urgently requires delivery of any quantity of an item before the earliest date that delivery may be specified under this contract, and if the Contractor will not accept an order providing for the accelerated delivery, the Government may acquire the urgently required goods or services from another source.

(f) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligation with respect to that order to the same extent as if the order were completed during the contract's effective period; provided, that the

4

> Contractor shall not be required to make any deliveries under this contract after **31 March 2017**.

(R4, tab 2 at 58 of 77)

7. The RFQ also contained FAR 52.217-6, OPTION FOR INCREASED QUANTITY (MAR 1989), which stated:

> The Government may increase the quantity of supplies called for in the Schedule at the unit price specified. The Contracting Officer may exercise the option by written notice to the Contractor within 3 days. Delivery of the added items shall continue at the same rate as the like items called for under the contract, unless the parties otherwise agree.

(R4, tab 2 at 59 of 77) The RFQ included FAR 52.217-9, OPTION TO EXTEND THE TERM OF THE CONTRACT (MAR 2000), which provided:

> (a) The Government may extend the term of this contract by written notice to the Contractor within 60 days; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 30 days before the contract expires. The preliminary notice does not commit the Government to an extension.
>
> (b) If the Government exercises this option, the extended contract shall be considered to include this option clause.
>
> (c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed 5 years 6 mos.

(*Id.* at 59-60)

8. Finally, the RFQ stated that quotes were due by 30 December 2011 at 4:00 p.m. local time (R4, tab 2 at 1 of 77).

9. On 12 December 2011, the government issued Amendment No. 0001 to the RFQ (R4, tab 3 at 1). Most importantly, the amendment clarified the estimated number of copies for each leased MFD per month (*id.* at 2-5). It also added the full texts of FAR 52.000-4014, WAGE DETERMINATION (4 DEC 02); and FAR 52.222-41, SERVICE CONTRACT ACT OF 1965 (NOV 2007) (*id.* at 5-6).

10. On 16 December 2011, Ricoh submitted various clarification requests to the government. Initially, it requested that the government remove the following language from item 15 of the statement of work (SOW): "Removal of MFDs will be at the contractor's expense. There is no early termination fee, penalty or cost associated with not exercising option years." (Supp. R4, tab 3 at 41) Ricoh stated that this language was in conflict with the termination for convenience language contained in subsection (l) of FAR 52.212-4, CONTRACT TERMS AND CONDITION–COMMERCIAL ITEMS. It specifically cited this sentence:

> Subject to the terms of this contract, **the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination.**

(Supp. R4, tab 3 at 41) As part of this clarification request, Ricoh also argued that the absence of early termination fees was in conflict with common commercial practices, as well as Pub. L. No. 103-355. It stated that "[i]**t is customary in the commercial copier industry to enter into a lease with a decreasing payment schedule.**" Ricoh concluded that the lack of an early termination fee was inconsistent with common practices. It requested that the language be deleted from the RFQ. (*Id.* at 42)

11. Ricoh also sought clarification of the following, pertinent items:

> **What type of contract is Ft Stewart implementing? Lease contract under FAR is multiyear, if this is Ft. Stewart's intension [sic], please confirm[.]**
>
> **Is this a GSA award?**
>
> **Is Ft. Stewar[t] looking for a firmed fixed price request?**

(Supp. R4, tab 3 at 43)

12. Mr. Jeffrey Talley, Ricoh's sales representative for Fort Stewart, forwarded a copy of the questions to Mr. Anthony Justi, the Garrison's contracting officer's representative (COR). In his cover letter, Mr. Talley stated:

> Here are the questions sent to contracts. I would suggest that when Contracts contacts you, please emphasize on the

question regarding cancellation that Ft Stewart is not looking to cancel the entire contract but only units that may no longer be needed or have funded out[.] On the existing contracts Ft. Stewart has actually added units.

(Supp. R4, tab 1 at 49)

13. On 20 December 2011, Ms. Marvene Falgout, a government contract specialist, forwarded an email to Ricoh, in which she wrote: "Will review your questions.... You can bid your schedule with our solicitation or you can bid open market. Thanks." (App. supp. R4, tab 50 at 149-50)[2]

14. On 21 December 2011, the Army issued Amendment No. 0002 to the RFQ. The amendment extended the closing date from 30 December 2011 to 9 January 2012. (R4, tab 4 at 1) It also revised the RFQ's SOW to increase the estimated number of copies for certain MFDs. The amendment reiterated that the RFQ contemplated a requirements-type contract; it also stated, once again, that "[t]here is no early termination fee, penalty or cost associated with not exercising option years." (*Id.* at 2, 16)

15. On 6 January 2012, Ricoh forwarded its quote to the Army in which it set forth unit prices for the various contract line item numbers (CLINs) (R4, tab 5). On 9 January 2012, the Army issued Amendment No. 0003 to the RFQ. It stated:

> THE ABOVE REFERENCED SOLICITATION IS HEREBY AMENDED TO ADD QUESTIONS AND ANSWERS FROM CONTRACTORS, CHANGE THE STATEMENT OF WORK AND ADD CLINS. SEE SUMMARY OF CHANGES.

(R4, tab 6 at 1). The amendment also extended the required response date to 13 January 2012 (*id.* at 2). As a result, Ricoh retracted its quote (supp. R4, tab 7 at 1).

16. Regarding Ricoh's questions and assertions about the lack of an early termination fee associated with not exercising option years, the Army, through Amendment No. 0003, answered as follows:

> **ANSWER: there is no early termination fee, penalty or cost associated with not exercising option years IS NOT in conflict with the FAR clauses. This is in clause**

---

[2] Through at least two pieces of correspondence, Ricoh acknowledged that the RFQ precluded an early termination fee (app. supp. R4, tab 49 at 134; supp. R4, tab 5 at 140-41).

7

**52.217-9, OPTION TO EXTEND THE SERVICE. We are not talking about termination of contract, we are talking about not excertion [sic] the OPTION YEARS. Option years are just that – Options. The government request you price the option years, however, we might not exercise the option due to money, deployment, etc.**

(R4, tab 6 at 13)

17. Based upon the Army's answers to its questions, particularly regarding the lack of an early termination fee, Ricoh's employees formulated a response to the RFQ. However, in addition to the price quote which it had previously submitted and withdrawn, Ricoh's response included two other elements which had not been solicited by the Army's RFQ.[3] One was a so-called "TECHNICAL PROPOSAL RESPONSE" which encompassed more than 70 pages (R4, tab 8, *passim*). Ricoh submitted a third part which contained additional supporting documentation (supp. R4, tab 10). In its technical proposal, Ricoh responded to the paragraphs of the Army's SOW. Specifically, Ricoh stated a period of performance of 60 months, not the base period of 12 months and 4 option periods contained in the RFQ (R4, tab 8 at 264).

18. More to the point, disregarding the plain language contained in both the RFQ and Amendment No. 0003, Ricoh's technical proposal included a section defining "EARLY TERMINATION CHARGES." It provided:

> Equipment leased under this agreement may be terminated at any time during a Government fiscal year by the Ordering Agency's Contracting Office responsible for the delivery order in accordance with FAR 52.212-4, paragraph (1) Termination for the Government's Convenience. If the Government exercises its rights pursuant to FAR 52.212-4(1), or discontinues the lease (exclusive of a non-appropriation), the Government agrees to return the leased equipment and pay Contractor the remaining Lease Payments due for the Lease Term from the due date of the termination payment ("Termination Charge"). If the Government discontinues, terminates, or fails to renew part of an order, irrespective of reason, the Government shall pay that portion of the Termination

---

[3] Ricoh's price quote is set forth at Rule 4, tab 8 at 336-38. In the cover letter which accompanied its price and technical quotes, Ricoh acknowledged receipt of the amendments which included the Army's responses to its questions (*id.* at 258).

Charge equal to the percentage of terminated or not renewed equipment.

- The Termination Ceiling Charge represents the value of the work, exclusive of on-going maintenance and/or services, that the Contractor may claim performed at any given time during the Lease Term and represents the amount due for that work in the event of a termination for convenience of the lease or failure to renew a lease prior to expiration of the Lease Term for any reason other than lack of funding.

- Termination ceiling charges will apply for each year of the lease term (See FAR 17.1). The Ordering Agency and contractor shall establish a Termination Ceiling amount.

- The Contracting Officer shall insert the Termination Ceiling Charge for amount of the first year in the order and modify it for successive years upon availability of funds.

- No claim will be accepted for future costs: supplies, maintenance, usage charges or interest expense beyond the date of cancellation.

- In accordance with the bona fide needs rule, all termination charges must reasonably represent the value the Ordering Agency received for the work performed at cancellation based upon the shorter lease term.

- No termination cost will be associated with the expiration of the lease term.

(R4, tab 8 at 265) The language contained in Ricoh's technical proposal notwithstanding, there is no record evidence demonstrating that the parties ever established a termination ceiling amount.

19. On 7 February 2012, the Army notified Ricoh that it was the apparent low bidder (supp. R4, tab 10 at 902). On 9 February 2012, the Army forwarded a copy of the contract to Ricoh. It stated: "It is a delivery order requirements type contract. We

will be cutting the 1st two delivery orders as soon as budget gets us the purchase requests here. You will get two, one will be for Garrison and one will be for Division. Congrats." (Supp. R4, tab 11 at 427)

20. The contract's "Period of Performance" was set forth as follows:

| Base Period | 1 April 2012 – 31 March 2013 |
| Option Period 1 | 1 April 2013 – 31 March 2014 |
| Option Period 2 | 1 April 2014 – 31 March 2015 |
| Option Period 3 | 1 April 2015 – 31 March 2016 |
| Option Period 4 | 1 April 2016 – 31 March 2017 |

There is no early termination fee, penalty or cost associated with not exercising option years.

(R4, tab 1 at 56)

21. Ms. Becky Niksch, the CO, awarded the contract on Standard Form 1449 (REV 3/2005). With respect to the scope of the award, item 29 stated "SEE SCHEDULE." (R4, tab 1 at 1) By the phrase, "SEE SCHEDULE," the CO was conveying her intent only to accept Ricoh's schedule of prices. Accordingly, the Army did not incorporate into the contract either Ricoh's technical proposal or its supporting documentation. The CO explained that the Army would have altered the solicitation if it included in the contractual award items that were not contained in the RFQ, as amended, as they were nonresponsive. If the Army had included these items in the contract, it would have been required to resolicit the contract to be fair to the other offerors. (Tr. 1/159-60) Ms. Niksch's testimony is corroborated by the fact that the physical contract, as awarded, contained only Ricoh's pricing schedule. It did not include the technical proposal submitted by Ricoh (R4, tab 1, *passim*). The contract did contain all of the standard FAR clauses which were a part of the RFQ (*id.* at 31-55).

22. As awarded, the contract thus functioned as a master pricing agreement. It provided for the issuance of delivery orders which served as offers to be accepted by Ricoh through actual performance (R4, tab 1 at 45).

23. During the contract's base period of performance, which extended from 1 June 2012 to 31 May 2013, the Army issued five delivery orders, using Standard Form 1449 as a contractual vehicle (R4, tabs 9, 11, 14, 16, 17). Through the first delivery order, the Army leased 580 MFDs for the 3rd ID; and by the second delivery order, the Army leased 280 MFDs for Fort Stewart's Garrison (R4, tabs 9, 11).

10

24. As a result of congressionally-mandated budget cuts known as "sequestration," the overall amount of funds available to Fort Stewart during the contract's first option year declined substantially. Accordingly, government officials such as Ms. Polly Williams, the 3rd ID's resource management officer, reviewed all of the division's contracts to determine where and how steeply corresponding cuts were to be made. As a result, the number of MFDs ordered by the division was substantially reduced during the contract's first option period. (Tr. 2/8-15)

25. As a result of the reduction in funding, the Army, in early March 2013, investigated the usage rate for the approximately 584 MFDs leased by the division through the Ricoh contract. Of this total, the Army concluded that 88 of the machines had a usage rate of less than 8 percent. These MFDs were "locked up in a building that a unit moved out of several months ago (these are not units that are deployed and will return to these buildings)." (Supp. R4, tab 43 at 418)

26. In April 2013, representatives of the Army and Ricoh met to determine whether the government might issue a delivery order for MFDs for another unit at Fort Stewart; the hospital. As part of the conversation, Ricoh's sales representative, Mr. Talley, stated that the pricing under the contract at issue in this appeal was not fair to Ricoh, at least partially because the CO had not inserted an early termination fee clause in that instrument. (Tr. 2/27-29) The discussions relating to the hospital's requirements did not come to fruition (tr. 2/30).

27. On 12 April 2013, the Army forwarded the following email to Ricoh:

> The contracting office was notified today that the 3rd Infantry division is planning to cut 203 devi[c]es off of the first option period.
>
> Based on the Statement of Work, paragraph 4. Period of Performance, "There is no early termination fee, penalty or cost associated with not exercising option years." In Paragraph 15, "Upon receipt by the contractor of written notice from the contracting officer, MFD service may be discontinued 30 days thereafter."
>
> I also looked at the terms in FAR 52.218-18 and FAR 52.218-19 that sets specific ordering limits (no less than 1 and no more than 20 in a single task order).
>
> The contract also contains the clause 52.216-21 Requirements.

11

I could not find any provisions that would allow for a
termination fee.

(Supp. R4, tab 17 at 215) On that same day, Ricoh responded: "Am checking on it as well. In the meantime, can you provide the Bands [sic - devices] by quantity Division is wanting to return." (*Id.* at 214)

28. On 16 April 2013, the Army provided notification to Ricoh "of the government's intent to exercise the next option period for the Copier Leases." The Army also stated: "If the Government elects to exercise this option, it will be done by modification to the contract and will be issued at least thirty (30) days prior to the date for commencement of services for the option period." (Supp. R4, tab 18)

29. On 26 April 2013, the Army forwarded an email to Ricoh "to comply with the 30 day notification requirement set forth in the base contract of any changes in services." It stated, in part:

> The Delivery order in effect for 3ID copiers is due to
> expire on 31 May 2013. Our office has confirmed that the
> 3ID requirements for the next delivery order will be
> reduced by 213 MFDs. Garrison has not provided exact
> numbers, and does not expect any major fluctuation in
> quantities in the foreseeable future.

(R4, tab 19)

30. On 22 May 2013, the Army issued Modification No. P00005 to exercise the first option period. It stated, in part: "This supplemental agreement is issued to exercise the option to extend the term of the contract for the period 1 Jun 2013 through 31 May 2013 at prices set forth in the Bid Price Schedule for the 1st option period."[4] The modification also included a "RELEASE OF CLAIMS," which provided:

> In consideration of the modification agreed to herein as
> complete and equitable adjustment for the changes
> incorporated herein, the Contractor hereby releases the
> Government from any and all liability under this contract
> for further equitable adjustment attributable to such facts

---

[4] The end date of 31 May 2013 was a typographical error. It should read: "31 May 2014." (Tr. 2/34)

12

or circumstances giving rise to the aforesaid changes
without exception.

(R4, tab 22 at 454) A representative of Ricoh signed a copy of this modification (*id.* at 455). The modification did not, in and of itself, alter the number of MFDs ordered by the government.

31. On 29 May 2013, the Army issued Delivery Order No. 0006 for the 3rd ID. It leased 372 MFDs (R4, tab 24); and, on the same date, it issued Delivery Order No. 0007 for the Garrison. It ordered 279 MFDs, which was only one less than it had ordered during the contract's base period. (R4, tab 25)

32. On 17 September 2013, Ricoh forwarded a certified claim to the CO in a total amount of $771,131.03, plus interest. It contended that the Army, by discontinuing the lease of 208 MFDs during the contract's first option period, had partially terminated the contract for convenience. Alternatively, Ricoh argued that the delivery orders executed during the first option year constituted a unilateral deductive change order for which it should receive compensation. (R4, tab 28 at 1-3) In addition, Ricoh alleged that the Army had accepted its technical proposal which envisioned the imposition of early termination fees for the discontinued MFDs (*id.* at 4).

33. On 23 April 2014, the Army issued Modification No. P00007, which exercised the second option period. The modification contained the identical "RELEASE OF CLAIMS" language which was included in Modification No. P00005. A representative of Ricoh signed the document. (Supp. R4, tab 40; finding 27) As was the case with Modification No. P00005, this modification did not, in and of itself, alter the number of MFDs ordered by the government.

34. On 25 April 2014, the CO issued a final decision denying Ricoh's claim in its entirety (R4, tab 31). This appeal followed.

35. Subsequently, Ricoh responded to the Army's interrogatory no. 16 by stating that it had sold the discontinued MFDs for a total price of $183,325.10. At the hearing, Ricoh confirmed the correctness of this response. (Tr. 2/62-68)

## DECISION

The crux of this appeal revolves around several issues of contractual interpretation. Indeed, the parties' disputes encompass even the existence and scope of the underlying contract. However, a detailed analysis of the various contractual provisions at issue demonstrates a clarity which is lacking in many of the parties' allegations. Specifically, this was a requirements contract which, by its very nature,

13

gave the Army a great deal of flexibility in ordering MFDs from Ricoh (finding 6). Further, the RFQ stated plainly that "the Government expects to add or remove an undetermined number of MFD's as requirements change due to organizational realignment or organizations added or deleted or combined" (finding 2). The RFQ reiterated this point when it provided: "No guarantee is given that listed quantities will be leased. Estimated quantities are based on current number of MFDs approaching contract ending dates and projected new business." (Finding 3) Similarly, the RFQ stated:

> The government reserves the right to increase or decrease quantity of MFDs throughout the duration of the contract by modification. Government shall provide vendor with thirty days notice when requesting additions or deletions.

(Finding 4) Finally, the RFQ provided for "Discontinuance of Service" for individual MFDs. It stated, in pertinent part: "There is no early termination fee, penalty or cost associated with not exercising option years." Thus, the context for the "no early termination fee" statement was the discontinuance of quantities of MFDs during the exercised option years, not the actual exercise of the options themselves. (Finding 5)[5] Ricoh's sales representative, Mr. Talley, was aware of the context of this "no early termination fee" statement. In a cover letter accompanying Ricoh's questions, he stated that "regarding cancellation...Ft. Stewart is not looking to cancel the entire contract but only units that may no longer be needed or have funded out." (Finding 12) Through clarification requests which it submitted in response to the RFQ, Ricoh asked the Army to remove this clause (finding 10). The Army declined (finding 13).

The scope of the contract itself is disputed by the parties. First, we note that the solicitation, as issued, took the form of an RFQ, not an RFP (finding 1). This is significant because the Army was merely soliciting price quotes, not technical proposals. By submitting materials that were outside the scope of the RFQ, Ricoh was nonresponsive to the RFQ. Accordingly, the CO accepted only Ricoh's "SCHEDULE" of prices (finding 21). This fact is corroborated by the physical contract which the CO executed and forwarded to Ricoh. It contained only Ricoh's pricing schedule. It did not include Ricoh's technical proposal which contained the proposed, changed early termination fee language. (Findings 18, 21) Therefore, that language was not part of the contract.

Ricoh makes several arguments which detract from the clarity of our findings. For example, it argues that the Army accepted its "offer" which contained an early

---

[5] All of these cited provisions were contained in the contract as awarded (R4, tab 1, *passim*).

14

termination charges clause (app. br. at 14-16). This is simply not the case. As we have concluded, the Army accepted only accepted Ricoh's schedule of prices and did not include its technical proposal in the contract, as awarded.

Ricoh also argues that the Army failed to notify it that it did not intend to accept its technical proposal (app. br. at 16-18). This is not correct. Through the contractual award, the CO referenced only Ricoh's schedule of prices. Moreover, the copy of the contract which she executed and forwarded to Ricoh did not contain the technical proposal. These facts, taken together, placed Ricoh on notice of the contract's scope. Despite this conclusion, Ricoh made no further inquiries and, subsequently, engaged in contractual performance upon receipt of various delivery orders. *See, e.g., ADT Construction Group, Inc.,* ASBCA No. 55125, 06-1 BCA ¶ 33,237 at 164,702-04, *recon. denied,* 07-1 BCA ¶ 33,501, *affirmed,* 259 F. App'x 310 (Fed. Cir. 2007).

Ricoh also contends that the termination charges clause in the solicitation was limited to the exercise of option years (app. br. at 30-32). In formulating this argument, Ricoh ignores the clause's context. As we have stated, the clause was developed in the context of the discontinuance of certain quantities of MFDs during the exercised option years, not the actual exercise of the options themselves.

Finally, we agree with Ricoh's argument that it did not release its claim for early termination fees and related expenses by signing modifications to the contract (app. br. at 32-35). The release language contained in the modifications applied by their terms only to "changes incorporated herein." The only changes made by the modifications were the exercise of contractual options. Accordingly, the language does not apply to the delivery orders which were subsequently issued by the Army and did not contain releases. (Findings 30, 33)[6]

We have carefully analyzed Ricoh's remaining arguments and reject them.

---

[6] Based upon our denial of Ricoh's claim, we reach no conclusion regarding its sale of discontinued MFDs (finding 35).

15

## CONCLUSION

The Board denies the appeal.

Dated: 5 December 2016

MICHAEL T. PAUL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59408, Appeal of Ricoh USA, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

16